**In re CHAMBERS, Randy S. and Chambers, Laura J., Debtors.**

**SPECTRUM PAINT COMPANY, INC., an Oklahoma Corporation, Plaintiff,**

**v.**

**Randy S. CHAMBERS and Laura J. Chambers, Defendants.**

**Bankruptcy No. 97-03428-R. Adversary No. 97-0361-R.**

United States Bankruptcy Court, N.D. Oklahoma.

Oct. 5, 1998.

Gary Grisso, Tulsa, OK, and Ryan Assink, for Defendants/Debtors.

Blaine Frizzell and Steven Chlouber, Tulsa, OK, for Plaintiff.

*MEMORANDUM OPINION*

DANA L. RASURE, Chief Judge.

On October 27, 1997, Spectrum Paint Company, Inc. ("Spectrum"), filed its Complaint to determine dischargeability of certain debts (the "Complaint") against Debtors Randy S. Chambers ("Mr. Chambers") and Laura J. Chambers ("Mrs. Chambers") (collectively sometimes referred to as the "Chambers"). The Debtors/Defendants filed their Answer to Adversary Proceeding (the "Answer") on November 18, 1997.

In its Complaint, Spectrum seeks a determination of dischargeability under 11 U.S.C. § 523(a)(4) ("Section 523(a)(4)") of a debt owed to Spectrum in the stipulated amount of $15,719.35. Spectrum contends that the Chambers, as painting contractors, misappropriated proceeds of painting contracts by failing to hold such proceeds in trust for materialmen who provided materials in connection with such work. Specifically, Spectrum contends that as a beneficiary of a statutory trust established by 42 O.S.1991, §§ 152 and 153 (the "Construction Trust Fund Statutes"), Spectrum was entitled to payment from such contract proceeds for paint and other supplies that it provided to the Chambers on credit for performance of such contracts, and contends that the Chambers misappropriated the proceeds in violation of the Construction Trust Fund Statutes. Spectrum contends that the Chambers' conduct constitutes (1) embezzlement and/or (2) fraud or defalcation by a fiduciary, and that such conduct renders the debt owed to Spectrum non-dischargeable under Section 523(a)(4).

In the Pre-trial Order entered on June 1, 1998, the parties included as an additional issue to be litigated the Chambers' contention that Spectrum had violated the automatic stay. At trial, the Chambers' introduced evidence that a Spectrum principal took post-petition action in connection with the criminal prosecution of Mr. Chambers which they allege was an effort by Spectrum to collect the debt from the Chambers in violation of 11 U.S.C. § 362.

The Court conducted a trial on the merits on June 12, 1998. Spectrum appeared through its Secretary/Treasurer Roddy Russo, and through its counsel, Blaine Frizzell and Steven Chlouber. Mr. and Mrs. Chambers appeared in person and through their counsel, Gary Grisso and Ryan Assink. The parties entered into stipulations of fact as reflected in the Pre-trial Order and stipulated to the admission of exhibits. The parties presented testimony through three witnesses: Mr. Russo, Mr. Chambers and Mrs. Chambers. Upon consideration of the pleadings, the stipulations, the exhibits admitted, the testimony elicited, the arguments of counsel, and applicable law, the Court makes the following findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

**Jurisdiction**

The Court has jurisdiction over this "core" matter pursuant 28 U.S.C. §§ 1334 and 157(b)(2)(I).

## Findings of Fact

In August 1993, Mr. Chambers opened a credit account (the "Account") with Spectrum in order to obtain paint and painting supplies on credit in connection with his painting business. Mr. Chambers contracted to perform painting services primarily with builders that erected new homes. Mr. Chambers obtained paint and supplies from Spectrum through April 30, 1997, at which time Mr. Chambers determined that he could no longer continue in the painting business due to the fact that his revenue was not sufficient to pay his labor, material and overhead expenses. The Chambers filed bankruptcy on July 25, 1997.

Although the balance owed on the Account was stipulated to be $15,719.35 [1] and that appears to be the amount that Spectrum claims is nondischargeable, Spectrum provided evidence of trust funds received by the Chambers from only three specific projects.[2] The total cost of the materials provided by Spectrum for use on the three specific projects was $5,993.43; therefore the alleged misappropriation and breach of fiduciary duty relates only to that portion of the total debt.

The relevant facts concerning the three projects, as found by this Court from the testimony of the witnesses and the documentary evidence submitted,[3] are summarized as follows:

*I The Claybrook Property*—4201 South 137th West Avenue, Sand Springs

From February 17, 1997 to February 24, 1997, Spectrum provided paint and supplies to Mr. Chambers for painting the Claybrook Property. The cost of the materials was $1,470.43. Owners Jerry and Sharon Claybrook paid Mr. Chambers a total amount of $9,730 in connection with painting the Claybrook Property as follows:

February 5, 1997: $2,000
February 21, 1997: $4,000
February 25, 1997: $3,730

On or about February 25, 1997, Mr. Chambers deposited $3,630 of the $3,730 payment into his business checking account. Also on February 25, 1997, Mr. Chambers paid $3,000 to Spectrum by virtue of a check from his business checking account. Mr. Chambers did not specifically indicate to Spectrum to which invoices the $3,000 payment should be applied, and Spectrum, despite its practice of keeping track of the projects for which materials were supplied, did not ask Mr. Chambers to which project(s) the funds should be applied. Spectrum applied the $3,000 payment against the oldest invoices, none of which related to the Claybrook Property. The parties testified that Spectrum demanded a payment of $5,000 in order for Mr. Chambers to continue obtaining materials on credit. Mr. Chambers paid only $3,000, but Spectrum continued to extend credit nonetheless.

On May 23, 1997, Spectrum filed a lien against the Claybrook Property in the amount of $1,470.43. In June 1997, Spectrum filed a lawsuit to foreclose the lien. Also in June 1997, Spectrum contacted Detective McMahan of the Tulsa Police Department in an attempt to instigate a criminal

1. On June 2, 1997, Mr. Chambers' balance on the Account was reduced by $489.72 by virtue of a payment to Spectrum by another contractor for whom Mr. Chambers performed painting services, which payment was intended to prevent Spectrum from filing a lien on the property involved. *See* Defendant's Exhibit 2. This amount was not deducted from the stipulated balance of $15,719.35. The Court finds that the balance on the date the bankruptcy was filed, after application of the June 2, 1997 payment, was $15,-229.63.

2. As evidence of the amount of the debt, Spectrum produced itemized statements for the period of January 2, 1997 through May 1, 1997, which reflect numerous charges that are not related to any of the three projects. Since the crux of the complaint is misappropriation of *funds entrusted* to the Chambers, the focus is on the Chambers' receipt of the proceeds and their subsequent disposition of the proceeds. No convincing evidence was presented with respect to the Chambers' receipt of proceeds from the other miscellaneous projects noted on Spectrum's billing statements.

3. With respect to Plaintiff's Exhibit 14, described as the Chambers' discovery responses, the Court was not supplied with the questions to which the responses were directed and therefore the writing is not particularly helpful. Nor did Mrs. Chambers's testimony regarding Plaintiff's Exhibit 14 provide sufficient clarification to allow the Court to place any strong evidentiary value on Plaintiff's Exhibit 14.

prosecution against Mr. Chambers pursuant to 42 O.S.1991, § 153, for misappropriation of trust funds. Detective McMahan advised Spectrum that the homeowner having a lien on the home, not the materialman, was the victim of the crime described in Section 153. Spectrum contacted the Claybrooks and advised them that they may pursue criminal action against Mr. Chambers as a result of the lien. Mr. Chambers was arrested and charged with a criminal violation. In December 1997, in response to a request from Detective McMahan, a representative of Spectrum wrote a letter describing the factual basis for the lien on the Claybrook Property. Since trial of this case, the Tulsa County District Attorney has stated that the charge against Mr. Chambers would be dismissed if Mr. Chambers pays Spectrum the amount required to remove the lien from the Claybrook Property.[4]

***II The Greens at Cedar Ridge*** (the "Greens Property")—3808 South Yellow Pine, Broken Arrow ***(Paul Reed—general contractor)***

From March 10, 1997 to March 31, 1997, Spectrum provided materials to Mr. Chambers for painting the Greens Property. The cost of the materials was $2,806.74.

Paul Reed paid a total of $6,960 [5] to Mr. Chambers in connection with painting the Greens Property as follows:

March 14, 1997: $3,500
March 21, 1997: $1,800
March 28, 1997: $1,660 (from a check in the amount of $1,960; the remaining $300 was in payment for another job, as reflected by the notation on the check)

On or about April 11, 1997, Mr. Chambers paid $906.03 to Spectrum by virtue of a post-dated check written at the request of Spectrum on or about March 31, 1997, which Spectrum required from Mr. Chambers in order to continue charging on the Account.[6] The check was paid to Spectrum and Spectrum applied the $906.03 payment to the oldest remaining invoices—no evidence was presented as to which specific invoices were paid. Spectrum did not ask the Chambers whether the funds were trust funds from a particular job, and did not ask whether the payment should be applied to any particular invoices, nor did the Chambers direct Spectrum to apply the funds to any specific invoices.

On June 3, 1997, Spectrum filed its lien against the Greens Property in the amount of $2,806.74.

***III The Hartzell/Hanna Property***—11732 South 66th East Avenue, Bixby, Oklahoma ***(Paul Reed—general contractor)***

From April 17, 1997 to May 1, 1997, Spectrum provided materials to Mr. Chambers for painting the Hartzell/Hanna Property. The cost of the materials was $1,716.26. Paul Reed paid Mr. Chambers a total of $10,700 in connection with painting the Hartzell/Hanna Property as follows:

April 18, 1997: $1,500
April 25, 1997: $4,000
May 1, 1997: $5,200

None of the funds paid by Paul Reed for the Hartzell/Hanna project were paid to Spectrum. On June 3, 1997, Spectrum filed its

4. Mr. Chambers has caused a cashier's check payable to Spectrum to be issued in order to obtain the dismissal of the criminal action. Spectrum is hesitant to accept the payment without approval of this Court. The parties filed a Joint Motion for Approval of Disbursement of Funds on July 24, 1998, which is being held in abeyance pending this decision. The Court will issue a separate order in connection with the joint motion.

5. The parties stipulated that Paul Reed paid a total of $7,510 to Mr. Chambers for the Greens project. Mr. Chambers' records indicated payments of only $7,210, however, and Spectrum's exhibits, consisting of the checks written by Paul Reed to Mr. Chambers that were earmarked for the Greens project reflect payments of only $6,960. There was testimony that contractors routinely withheld $300 from the final payment pending a final inspection and performance of "touch up" work and it appears that Paul Reed withheld at least $300 on the Greens project. The disparity in the amount paid does not influence the result reached by the Court, however.

6. At or about the same time, the Chambers gave Spectrum a post-dated check in the amount of $5,672.81, also pursuant to instructions from Spectrum and as a condition of further extensions of credit by Spectrum, but the Chambers stopped payment on that check before the post-date arrived.

lien against the Hartzell/Hanna Property in the amount of $1,716.26.

On September 17, 1997, Paul Reed paid a bond of $2,145.33 to the Tulsa County Clerk to release the lien on Hartzell/Hanna Property. As a result, the Hartzell/Hanna Property is free of the lien. However, there is no evidence as to whether the funds are still held by Tulsa County or they have been released to Spectrum.[7]

In connection with Mr. Chambers' business practices and the course of conduct between the parties, Mr. Chambers testified that he was often 60 days past due on the Account, and Spectrum would advise him as to the amount past due and he would pay it in order to continue obtaining credit. Mr. Chambers also testified that he was unaware of the Construction Trust Fund Statutes and of the fiduciary duties imposed upon him.

Mr. Chambers testified that all the Claybrook payments were spent on labor and materials, that Mrs. Claybrook demanded two coats of paint, even though his estimate included only one coat, and that he was not paid for the additional materials and labor needed to install the two coats paint. Mr. Chambers also testified that the Greens Property project required additional paint and labor beyond that which was contemplated in the estimate, and therefore he did not make a profit on the Greens project.

Mr. Chambers also testified that his records do not reflect all the payments made to laborers because he often paid day laborers in cash. Further, not all of the funds paid to Mr. Chambers by Paul Reed and the Claybrooks were deposited into Mr. Chambers' business account. The ledger and checkbook introduced into evidence is therefore not a complete and accurate record of Mr. Chambers' revenues and business expenses.

## Conclusions of Law

### A. Dischargeability of Debt

Spectrum asserts that its claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(4), which states, in pertinent part:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> * * *
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

Spectrum has the burden to prove that its claim is nondischargeable by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The Court notes that no evidence was presented to indicate that Mrs. Chambers was personally liable to Spectrum on the Account. Nor did Spectrum present any theory or authorities that would render Mrs. Chambers liable for Mr. Chambers' debt to Spectrum. Therefore, judgment is entered in Ms. Chambers' favor on Spectrum's claims.

#### 1. Embezzlement

The elements of embezzlement are (1) the appropriation of funds for the debtor's own benefit by fraudulent intent or deceit, (2) the deposit of the resulting funds in an account accessible only to the debtor, and (3) the disbursal or use of those funds without explanation of reason or purpose. *See First State Insurance Co. v. Bryant (In re Bryant),* 147 B.R. 507, 512 (Bankr.W.D.Mo. 1992).

The Court finds that Spectrum did not prove that Mr. Chambers acted with an intent to defraud or deceive in his dealings with Spectrum. The evidence established that Mr. Chambers merely failed to generate enough revenue to pay his business expenses. Moreover, Mr. Chambers was unaware that payments made to him by the Claybrooks and by Paul Reed were funds that he was required, by statute, to hold in trust for his laborers and materialmen. Since Mr. Chambers believed that he had an unconditional right to the funds, he could not have intended

7. The Court's decision is based upon the assumption that the funds have not been paid to Spectrum. If Spectrum has recovered under the bond, it no longer holds a claim against Mr. Chambers for the cost of the Hartzell/Hanna Property materials and this judgment will be modified accordingly upon a motion to alter or amend so stating.

to deceive or defraud Spectrum. Spectrum's claim that the debt is nondischargeable due to embezzlement is therefore denied.

### 2. Fraud or defalcation while acting in a fiduciary capacity

Spectrum also contends that the Chambers committed fraud or defalcation while acting in a fiduciary capacity, rendering its debt is nondischargeable. "[A] finding of nondischargeability under § 523(a)(4) requires a showing of (1) the existence of a fiduciary relationship between the debtor and the objecting party, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship." *Antlers Roof-Truss and Builders Supply v. Storie (In re Storie),* 216 B.R. 283, 286 (10th Cir. BAP 1997) (citing *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1371 (10th Cir.1996)). Once the creditor has established that the debtor was a fiduciary and received funds in its capacity as fiduciary, the burden shifts to the debtor to account for the funds. *Id.* at 288.

Defalcation occurs when a fiduciary fails to account for funds that have been entrusted to him or her due to a breach of fiduciary duty, whether intentional, wilful, reckless or negligent. *See Storie,* 216 B.R. at 288. It is not a defense that the fiduciary did not know the law and the extent of the duties imposed—a fiduciary is charged with knowledge of the law and of its duties. *Id.*

In contrast to the broad interpretation of "defalcation" established in *Storie,* "the Tenth Circuit has interpreted 'fiduciary' narrowly to include only individuals operating under an 'express or technical trust.'" *Storie,* 216 B.R. at 290. An express trust may be created by statute. *See Tway v. Tway (In re Tway),* 161 B.R. 274, 279–80 (Bankr.W.D.Okla.1993). The Fifth Circuit Court of Appeals has determined that the Oklahoma Construction Trust Fund Statutes, 42 O.S. §§ 152, 153, create an express trust for the benefit of sub-contractors and materialmen, and therefore a fiduciary relationship between a construction contractor and its sub-contractors and materialmen. *See Carey Lumber Co. v. Bell,* 615 F.2d 370, 374 (5th Cir.1980).[8]

The Court therefore must examine the Oklahoma Construction Trust Fund Statutes to determine whether Mr. Chambers was a fiduciary under the statutes and if so, whether he complied with the fiduciary duties charged to him by such statutes.

Section 152 provides, in relevant part, as follows:

> **Proceeds of building or remodeling contracts, mortgages or warranty deeds as trust funds for payment of lienable claims**
>
> The amount payable under any building or remodeling contract shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable claims due and owing or to become due and owing by such contractors or subcontractors by reason of such building or remodeling contract.

42 O.S.1991, § 152(1).

Section 153 further provides:

> **Payment of lienable claims**
>
> (1) The trust funds created under Section 152 of this title shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims

8. While the issue of whether the Oklahoma Construction Trust Fund Statutes establish a fiduciary relationship has not been determined in this Circuit (*see, e.g., Storie,* where the case was remanded by the Bankruptcy Appellate Panel to determine *whether* a fiduciary relationship arose from the statutes), this Court agrees with the analysis set forth by the Fifth Circuit in the *Carey Lumber* case. The Fifth Circuit concluded that because the Oklahoma Construction Trust Fund Statutes define a trust res and charge the trustee with duties and restrictions in the use of trust funds, the statutes create an express trust. *See Carey Lumber,* 615 F.2d at 374–75. In addition, the express trust created by the statutes arises prior to the alleged misappropriation or misapplication of funds, therefore falling within the interpretation given to the term "fiduciary relationship" by the United States Supreme Court in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), which held that the fiduciary relationship contemplated by Section 523(a)(4) must be shown to exist prior to the creation of the debt in controversy (thereby excluding constructive trusts).

due and owing or to become due an owing shall have been paid.

(2) Any person willfully and knowingly appropriating such trust funds to a use not permitted by subsection (1) of this section, upon conviction, shall be guilty of embezzlement and shall be punished by imprisonment in the State Penitentiary for a period not to exceed five (5) years or by a fine not to exceed Ten Thousand Dollars ($10,000.00), or by both such imprisonment and fine.

* * *

(4) The existence of such trust funds shall not prohibit the filing or enforcement of a labor, mechanic or materialmen's lien against the affected real property by any lien claimant, nor shall the filing of such a lien release the holder of such funds from the obligations created under this section or Section 152 of this title.

42 O.S.1991, § 153.

Under these statutes, the Court concludes that upon receipt of payments from the Claybrooks for work performed on the Claybrook Property and payments from Paul Reed for work performed on the Greens Property and the Hartzell/Hanna Property, Mr. Chambers was required to hold such funds in trust and pay from those funds the labor and materials expenses associated with each project before using the funds for any other purpose.

Having established that trust funds were received by Mr. Chambers, the burden shifts to Mr. Chambers to account for his disposition of the trust funds.

Mr. Chambers used $3,000 of the proceeds of the Claybrook project to pay Spectrum. To the extent that Spectrum failed to apply the funds to the invoices attributable to the Claybrook project, the Court finds that Spectrum is estopped from objecting to Mr. Chambers' application of such funds. Spectrum was aware of the Construction Trust Fund Statutes and, for its part and for the purpose of establishing lienable claims, kept itself apprised of the use and disposition of the materials and supplies it sold to Mr. Chambers. In anticipating that it may file liens to recover payment for paint and supplies supplied to Mr. Chambers, Spectrum had a duty to make inquiry as to the source of payments made on the Account in order to make proper application of potential trust funds.

The Oklahoma Supreme Court, in the case of *McGlumphy v. Jetero Construction Co.*, 593 P.2d 76, 82 (Okla.1978), held, in a case with similar facts, that a supplier with "notice of circumstances sufficient to put a prudent man upon inquiry" that funds paid to it may be trust funds under the Construction Trust Fund Statutes, "is deemed to have constructive notice" of the trust character of the funds if no inquiry is made with reasonable diligence. The supplier is "required to inquire as to the source of payments ... sufficient to make proper distribution of payment of valid lienable claims with any monies impressed with the statutory trust by §§ 152, 153, rather than a blanket application to the oldest purchase," even where the parties had *agreed* to apply such payments to the past due balance. *Id.* In essence, the Oklahoma Supreme Court did not allow the supplier to ignore the trust fund statutes in applying funds received by it if the supplier desired to claim the advantage of the trust fund statutes.

In this case, Spectrum was sufficiently informed about Mr. Chambers' painting contracts to have reason to inquire as to the source of funds paid to Spectrum by Mr. Chambers, and to inquire about how such funds should be applied in order to comply with the Construction Trust Fund Statutes. This is so even though Spectrum and Mr. Chambers may have had an understanding that Spectrum would apply the funds to the oldest balances. It would be inequitable to permit Spectrum to encourage, aid and abet Mr. Chambers in misapplying trust funds and thereafter take advantage of Mr. Chambers' error by charging him with misapplication of trust funds.[9]

9. While ignorance of the Construction Trust Fund Statutes does not excuse defalcation, the Court must look at the relative conduct of the parties in this case. Spectrum exercised unilateral control over the application of funds paid by Mr. Chambers toward lienable claims. Further,

With these principles in mind, the Court concludes that the $3,000 payment to Spectrum on February 25, 1997, consisted of proceeds of Mr. Chambers' contract with the Claybrooks, and that Spectrum would have learned as much upon inquiry and would have been bound to apply the funds to the Claybrook invoices. Since the Claybrook invoices totaled only $1,470.43, the Court finds that the Claybrook invoices were fully paid and that Mr. Chambers has reasonably accounted for application of the Claybrook funds so far as Spectrum's claim is concerned.

According to the ledgers and checkbooks presented at trial, from the proceeds of the Greens Property project (totaling $6,960), Mr. Chambers paid the following lienable claims: $4,017 for contract labor, $906.03 to Spectrum, and $119.32 to other materialmen. The remaining proceeds of $1,917.65 were taken by Mr. Chambers as draws (a portion of which was distributed to day laborers), expended on overhead expenses (insurance, gas, etc.), or were otherwise unaccounted for. The Court therefore concludes that Mr. Chambers accounted for some, but not all of the proceeds of the Greens Property contract that constituted trust funds for payment of lienable claims. After applying the $906.03 payment against Greens project invoices totaling $2,806.74, the Court concludes that Mr. Chambers failed to apply trust funds in the amount of $1,900.71 to Spectrum's lienable claims, and therefore Spectrum's claim in such amount is non-dischargeable.

In connection with the Hartzell/Hanna Property, the Court concludes that none of the proceeds of Mr. Chambers' contracts with Paul Reed were paid to Spectrum for application to lienable claims, although the proceeds may have been applied to other lienable claims, such as contract labor. However, Mr. Chambers failed to present sufficient evidence to account for the application of those trust funds and failed to apply trust funds toward Spectrum's lienable claims in the amount of $1,716.26, and therefore Spectrum's claim in such amount is also nondischargeable.

The Court therefore enters judgment in favor of Spectrum and against Mr. Chambers only in the amount of $3,616.97, such amount being nondischargeable pursuant to Section 523(a)(4).

### 3. Violation of Automatic Stay

The Chambers contend that Spectrum violated the automatic stay when it sought prosecution of Mr. Chambers under 42 O.S.1991, § 153, for misappropriation of trust funds. The evidence indicated that except for the letter written in December 1997 at the request of the prosecutor, all actions taken by Spectrum in connection with any potential criminal prosecution of Mr. Chambers occurred prior to the filing of the Chambers' bankruptcy petition on July 25, 1997. The Court further finds that the December 1997 letter was not an action by a creditor against the debtor but was a response to a request by the prosecutor for evidence. Moreover, Section 362(b) provides that the filing of a petition does not operate as a stay of the commencement or continuation of a criminal action or proceeding against the debtor. 11 U.S.C. § 362(b)(1). The Court therefore concludes that Spectrum did not violate the automatic stay by its participation in the criminal prosecution of Mr. Chambers.

## Conclusion

The Court concludes that judgment should be entered (1) in favor of Mrs. Chambers and against Spectrum on Spectrum's claims; (2) in favor of Spectrum and against Mr. Chambers only in the amount of $3,616.97, which debt shall be nondischargeable pursuant to Section 523(a)(4); and (3) in favor of Spectrum on the Chambers' claim that Spectrum violated the automatic stay.

A separate judgment will be entered consistent with this Memorandum Opinion.

Spectrum took advantage of Mr. Chambers' ignorance of the law to manipulate the application of trust funds for its own benefit.